UNITED STATES v. PARKBELT HOMES, Inc.

Civ. A. No. 3423.

District Court, D. Maryland.
March 10, 1948.

James B. Murphy, Asst. U. S. Atty., and Bernard J. Flynn, both of Baltimore, Md., U. S. Atty., Thomas L. McKevitt, of Washington, D. C., for plaintiff.

Richard F. Cleveland, of Baltimore, Md., for defendant.

CHESNUT, District Judge.

In this case the United States sues the defendant for an amount of taxes on certain real estate leased by the United States to the defendant, the lease containing an agreement by the defendant to pay taxes in addition to other sums. The lease was dated January 1, 1938, and was for a period of ninety-nine years. The taxes sued for cover the period from August 1, 1938 to December 31, 1946 both inclusive but limitations has not been pleaded and is con-

ceded not to be applicable against the United States. The total amount of the taxes claimed for the whole period is in the principal sum of $7,551.87 with three percent interest thereon from August 9, 1946.

The lease originated from the following situation. During the economic depression existing for some years prior to 1938, the United States acting under the authority of the National Industrial Recovery Act, 48 Stat. 195, the Emergency Relief Appropriation Acts of 1935, 1936, 1937, 49 Stat. 115, 1608, 50 Stat. 352, 15 U.S.C.A. §§ 721–728 note, and certain executive orders, acquired more than 3,000 acres of land in Prince George's County in the State of Maryland and proceeded to develop it for the purposes of constructing low rent housing accommodations. In consequence thereof the property has been very largely developed and constitutes what is now known as the Greenbelt Project. It has been developed as an integrated community, housing several thousand persons and containing many community facilities including stores, schools, a theater, recreation fields for children and a swimming pool. Land for many similar projects has been acquired and developed by the United States in Maryland and in other states. As such properties are owned by the United States they would not be subject to local state, county or municipal taxes without the consent of Congress. The withdrawal of such large amounts of land from local taxation led to the passage by Congress of the Bankhead and Lanham Acts, 40 U.S.C.A. § 432, 49 Stat. 2036, 42 U.S.C.A. § 1546, 54 Stat. 1127, in which Congress gave its consent to the payment by the "Resettlement Administration" to local taxing authorities of sums in lieu of taxes. By the first act it was provided that the "Resettlement Administration" is authorized to enter into an agreement with the local taxing units and the amounts to be paid by the United States in lieu of taxes were described as "Such sums shall be fixed in such agreement and shall be based upon the cost of the public or municipal services to be supplied for the benefit of such project or the persons residing on or occupying such premises, but taking into consideration the benefits

to be derived by such State or subdivision or other taxing unit from such project."

In the second Act the amounts to be paid were thus described, "The amount so paid for any year upon such property shall approximate the taxes which would be paid to the State and/or subdivision, as the case may be, upon such property if it were not exempt from taxation, with such allowance as may be considered by him (the administrator) to be appropriate for expenditure by the Government for streets, utilities, or other public services to serve such property".

Pursuant to this authorization an agreement was made and from year to year has been continued under which a certain sum in lieu of taxes has been paid by the Government to the local taxing authorities for state, county, and municipal taxes.

Although practically all of the land acquired by the Government for the Greenbelt Project has been developed for housing and community facilities by and at the cost of the Government, a very small portion thereof, slightly more than three acres, was leased by the Government to the defendant, Parkbelt Homes, Inc., for development by that private corporation. The lease in this case was made for that purpose, and on the land so leased the defendant has constructed ten individual houses the owners or occupants of which have the benefit of the community facilities in Greenbelt which itself has been incorporated as a municipality within Prince George's County. In addition to the agreement to pay certain rentals, the lease contained a clause whereby the lessee agreed to pay a certain proportion of the whole amount of taxes which were to be paid by the Government to the local taxing authorities in accordance with the Bankhead and Lanham Acts. The clause of the lease reads as follows: "4. In addition to the rent reserved in paragraph 3 of this Lease, the Lessee agrees to pay to the Lessor the pro rata share attributable to the Property (including all improvements and structures thereon) of (a) all taxes and special assessments levied on the Project, and (b) all payments in lieu of taxes and special assessments made by the Lessor on account of the Project. Such pro rata share of

taxes, special assessments, and payments in lieu of taxes shall be computed by multiplying the total amount of taxes, special assessments, and payments in lieu of taxes for any year on the Project, by a fraction the numerator of which shall be the value of the Property, including improvements and structures thereon, as determined by the Lessor, and the denominator of which shall be the value of the Project as determined by the Lessor. In determining such valuations, the Lessor shall consider such pertinent facts as may be submitted to it by the Lessee, and may consider the rentals paid for the various dwellings in the Project. The payments provided for in this paragraph shall become due and payable to the Lessor not less than sixty days after written notice is given the Lessee of the amount of such payment, and shall bear interest at the rate of three per cent (3%) per annum from the date when due. It is mutually agreed that such obligations shall constitute a first lien on the leasehold interest of the Lessee, including all improvements thereon and other assets of the Lessee, and upon all rents and other revenues accruing to the Lessee. The Lessor agrees that it will promptly pay to the proper taxing and other authorities all taxes and payments in lieu of taxes paid to it by the Lessee which are applicable to the Property, and will save the Lessee harmless as a result of any failure on the part of the Lessor to make such payment."

It will be noted that the calculation for determining the amount of taxes to be paid by the Lessee was to be made in this way: " * * * by multiplying the total amount of taxes, special assessments, and payments in lieu of taxes for any year on the Project (Greenbelt), by a fraction the numerator of which shall be the value of the Property (Parkbelt), including improvements and structures thereon, *as determined by the Lessor*, and the denominator of which shall be the value of the Project *as determined by the Lessor*. In determining such valuations, the Lessor shall consider such pertinent facts as may be submitted to it by the Lessee, and may consider the rentals paid for the various dwellings in the Project (Greenbelt)." (Italics supplied.)

Pursuant to this clause of the lease the lessor made the determinations of values and applied the formula to determine the proportion of taxes to be paid by the lessee for proper proportion of the year 1938 and for each of the succeeding years and has rendered bills therefor to the lessee, but none of these have yet been paid by the lessee because immediately after the first bill was rendered it disputed the correctness of the percentage formula applied on the ground that the determination by the lessor of the value of the Project (Greenbelt) was greatly understated, although it did not then or now dispute the valuation of the Property (Parkbelt). Although no payments were made to the lessor, a mortgagee of the Parkbelt Property, a subsidiary of the Reconstruction Finance Corporation, demanded that, for the protection of its mortgage interest, an amount equal to the taxes demanded by the lessor should be paid in escrow to the mortgagee to be held pending the outcome of the controversy, and such payments have currently been made by the lessee to the mortgagee. As a result of negotiations by the parties with respect to the proper amount of taxes to be paid by the lessee, in 1946 a revision was made by the lessor of the amount demanded in order to give effect to what was then conceded an error in applying the formula. After this revision the lessor on August 9, 1946, again demanded the payment of taxes which however was still refused by the lessee which persists in its contention that the valuation of Greenbelt as determined by the lessor is greatly understated.

The revised determination of the value of Parkbelt for all the tax years involved is $26,546.00. The valuation of the whole of Greenbelt for the years 1938–1941 both inclusive was $3,257,010.00; and the valuation of the whole of Greenbelt for the years 1942–1946 both inclusive was $5,609,-868.00. The increase in the valuation of Greenbelt for the latter years was due to the fact that during the war there were very large housing additions made in Greenbelt. Applying the formula on these valuations the percentage of the whole taxes to be paid by Parkbelt for the years 1938–1941 is .815042 and for the latter years .4732018. However, the large in-

crease in buildings on Greenbelt for the latter years has resulted in a large increase in the total amount of taxes paid by the Government to the local taxing authorities for Greenbelt, with the result that the amount of taxes to be paid by Parkbelt under the formula of percentage application of the valuations is not greatly different but varies of course from year to year dependent upon the particuar annual tax rates of the state, county and municipality. The particular amounts for each of the years is stated in Paragraph 5 of the complaint. Excluding the amounts for 1938 (covering only 5/12 of the full year) and for 1946, for which year there was some delay: in paying the taxes due to the county (not here important) the average annual amount chargeable to Parkbelt was about $940.00.

The contention of the defendant is that the valuation of Greenbelt as determined by the lessor is grossly understated. In support of this contention the defendant has submitted the evidence by deposition of a Mr. Fisher, who was an officer of the defendant and who is an architect. He stated that he was in general quite familiar with the whole Greenbelt Project from its inception. He points out that the figures of cost for Greenbelt as contained in the Government books and records, aggregating something over $12,000,000, do not include many items of cost which really were incurred in the whole development. For instance he says that general overhead costs such as architects and engineers fees and other similar items of cost preparatory to actual construction have been omitted. He estimated that these would amount to about twenty-five percent of the total. He also pointed out that many specific items of community facilities such as schools, play grounds, swimming pool and other similar community necessities or conveniences have not been included in the total cost. It was his opinion that the actual total cost of Greenbelt was in excess of $17,-000,000.00. The defendant therefore contends that the much smaller valuation made by the lessor was arbitrary and capricious or, as expressed, purely "subjective"; and that the Court should determine from the evidence the proper valuation of Greenbelt and apply the formula accordingly.

In answer to this contention the lessor points out that it was expressly provided in the lease that the determination of the values were to be made by the lessor and that the valuation so made must be accepted as correct in the absence of proof that the lessor in determining the valuations was guilty of fraud or bad faith. Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106; Martinsburg & P. R. Co. v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255; United States v. Gleason, 175 U.S. 588, 605, 20 S.Ct. 228, 44 L.Ed. 284; Ripley v. United States, 223 U.S. 695, 32 S.Ct. 352, 56 L.Ed. 614; Oltedale v. United States, D. C., 39 F.Supp. 998, 1006. In support of the good faith of the lessor in making the valuation it has submitted the evidence of Robert L. Funk, an employee of the Public Housing Administration, who has had extensive experience in determining valuations of Government housing projects in recent years for tax purposes, including the Greenbelt Project. He has submitted detailed figures based on costs of reproduction and also upon the capitalization of the actual and prospective net income from the properties, which tend generally to support the valuations as determined by the lessor. On the reproduction cost basis the Greenbelt Project would be valued at about $5,000,000.00 for the years 1938-1941, and about $9,000,000.00 for the years 1942-1946. On the basis of capitalization of net income the valuation of Greenbelt for the latter years was about $8,000,000.00. Apparently pursuant to agreement with the taxing authorities of Prince George's County these valuations were respectively reduced by one-third in accordance with what was stated to be the county practice to assess property for tax purposes at sixty-six percent of full value. It is also stressed by the defendant that the valuation for Parkbelt has been made on precisely similar principles and that although certain community facilities have not been included in the valuation nevertheless they are reflected in the land and building valuation for the project as a whole including Parkbelt.

The parties have submitted for consideration little or no evidence bearing upon the whole problem other than that which

has been referred to regarding the valuations. Particularly there is no evidence with respect to the general situation and relationships of the parties prior to the making of the lease or other facts and circumstances from which the Court might obtain more help in determining the controversy. More particularly it should be noticed that the clause in the lease itself relating to the respective valuations of Greenbelt and Parkbelt provides that " * * * the Lessor shall consider such pertinent facts as may be submitted to it by the Lessee, and may consider the rentals paid for the various dwellings in the Project."

There is no evidence that the lessor has disregarded any pertinent facts so submitted by the lessee nor is there any evidence of any specific or particular facts or data that were actually submitted by the lessee. On the contrary it is stated in a generally explanatory letter from the Acting Commissioner of the Federal Public Housing Authority, dated August 9, 1946, to the defendant that consideration had been given to such pertinent facts as had been submitted either orally or in writing by the lessee.

■■■ As the lease provided that the valuations should be determined by the lessor and as they have been so determined they must be accepted as prima facie correct. And the burden of going forward with the evidence in this respect is clearly upon the defendant. The only evidence submitted by it is to the effect that the actual cost of Greenbelt has greatly exceeded the valuation as made by the lessor. Cost is only one factor in valuation, and I am unable to find from this fact alone that the lessor has acted arbitrarily and capriciously or in other than good faith in making the valuation for tax purposes, especially as the evidence sufficiently shows that the same basis of valuation was followed with respect to both Greenbelt and Parkbelt. The only possible exception to this lies in the contention of the defendant that the cost of certain general community facilities in Greenbelt have not been included in its valuation; but the lessor advances the quite reasonable ground for their exclusion in that their values are fairly reflected in the land and building values of the whole Project in which Parkbelt Property participates.

■■■ The defendant points out that this particular lease is unusual in its provision that the valuations of Parkbelt and Greenbelt should both be determined by the lessor itself, rather than by some named engineer, architect or other particular third person, even though employed by the lessor. Defendant's complaint is that this provision provides for a particularly "subjective" and therefore highly interested valuation of Greenbelt as compared with Parkbelt, by a highly interested party to the contract. And it may be suggested that the rule of the cases above cited where valuations or estimates or other determinations of quantity are made by an engineer, architect or similar designated person, must be accepted unless shown to have been made in what constitutes fraud or lack of good faith are not fully applicable. But this criticism of the alleged unusual feature of the lease is more nominal than substantial because in the very nature of things the valuation could not be made by the United States as a sovereign entity but obviously could only have been made for it by the administrator of some Governmental agency as has in fact been done. However assuming some distinction to exist in this respect I think the only difference is that the Court should possibly scrutinize the evidence with respect to the good faith of the valuations with more than usual care. After giving full weight to this consideration I still do not find anything like fraud or bad faith or gross mistake suggestive of the former, or arbitrary or capricious conduct on the part of the lessor in making these valuations.

It is certainly not surprising in view of the history and purposes of Greenbelt that its cost far exceeds its value even by the test of what constitutes just compensation under condemnation laws. Nor should we forget that the valuations were made for tax purposes only. Indeed in the particular case the real issue is not whether the valuations absolutely were fair and reasonable but rather only whether the formula for the ascertainment of the percentage of the

whole taxes to be paid by the lessee has been fairly applied in this case. If it is true as the lessor contends that the valuations both for Greenbelt and Parkbelt were made by applying the same principles of valuation then there is no just complaint by the defendant, and certainly no basis for a charge of lack of good faith on the part of the lessor. The defendant does not challenge the fairness of the valuation of Parkbelt which was originally put at about $40,000.00 but in revised percentage calculation has been reduced to $26,546.00. The reason for the voluntary revision by the lessor was that, in determining the amount of taxes to be paid to the local authorities by Greenbelt, the whole valuation was reduced by one-third in conformity with what was said to have been the generally prevailing practice locally. This reduction of one-third should also have originally been made in the case of Parkbelt; but it has now been made and the total claim is on the latter basis. When it is borne in mind that under the Bankhead Act the Government waived its immunity from local taxation only pursuant to an agreement to be voluntarily reached between its representatives and the local taxing authorities, it is not surprising that the valuation agreed upon should have reflected mutual concessions. The important factor in the problem to be borne in mind is that according to the evidence the same basis of valuation has been applied with respect to both Greenbelt and Parkbelt.

■ Nor does it appear from the evidence that the amount of taxes to be paid by Parkbelt are absolutely excessive and unreasonable in amount. The Parkbelt Property consists of three acres of land improved by ten individual houses on their separate lots. On the reproduction cost estimate submitted by Mr. Funk it is estimated that these ten houses contain 73,606 cubic feet which at the estimated cost of 50 cents per cubic foot would produce $36,800.00, in addition to the land value for the three acres. This estimate of building costs by cubic feet would seem to be reasonable when compared with very similar figures per cubic foot used by the witness in estimating the cost of other buildings and housing units in Greenbelt many of which were for group and not individual housing accommodations. It must also fairly be borne in mind that the Parkbelt Property is a part of and entitled to the general benefit of a highly localized and fully integrated community with unusual community facilities for education and recreation.

The aggregate amount of taxes so apportioned under the lease formula to Parkbelt amounts to less than $1,000 per year. This annual figure is less than four percent on the valuation of $26,546.00 (reduced from about $40,000), and this sum for annual taxes includes three separate tax rates; one of the State of Maryland (about 20 cents per hundred), another of Prince George's County at a rate of about $1.50 per hundred, and still a third, town taxes at the rate of over $2.00 per hundred. It is explained in the letter of August 9, 1946, supra, that these Greenbelt town taxes are unusually high by reason of the quality and quantity of the services rendered by the town in comparison with other towns generally and also because taxes per house are perhaps materially higher in a purely residential town than they would be in one containing a normal amount of commercial and industrial property.

■ As I find no fraud or bad faith or arbitrary or capricious action on the part of the lessor in determining the valuations, I conclude that the plaintiff is entitled to recover judgment for the full amount of its claim with three percent interest from August 9, 1946, a total of $7,910.59, for which latter amount the clerk is directed to enter judgment for the plaintiff.